```
            IN THE UNITED STATES DISTRICT COURT FOR THE
                     EASTERN DISTRICT OF VIRGINIA

                          Alexandria Division

UNITED STATES OF AMERICA,    )
                             )
        v.                   )
                             )    1:11cr489 (JCC)
MICHAEL MAKALOU,             )
                             )
     Defendant.              )
```

### M E M O R A N D U M   O P I N I O N

This matter is before the Court following a bench trial held on December 14 and 15, 2011, pursuant to a one-count criminal indictment against Defendant Michael Makalou. Makalou was indicted on October 5, 2011, and charged with assault with a dangerous weapon in violation of 18 U.S.C. § 113(a)(3). After reviewing and considering the relevant evidence, including exhibits and witness testimony at trial, the Court, for the reasons set forth below, finds Makalou guilty, and makes the following findings of fact and conclusions of law.

### I.   Findings of Fact

Defendant Michael Makalou was a political officer who worked for the United States Department of State. (Tr. 212:18-19, 213:8-10.)[1] He was most recently stationed at the United

---

[1] The parties agreed to incorporate the transcript of the December 8, 2011, suppression hearing as a part of the trial record. (Tr. 143:2-144:14.) As such, this Memorandum Opinion cites to the suppression hearing transcript in addition to the trial transcript. "Tr." refers to the trial transcript while "Suppression Hr'g Tr." refers to the suppression hearing transcript.

1

States Embassy in Dakar, Senegal.  (Tr. 213:8-25.)  In Dakar, Makalou resided with his wife (referred to herein as "A.C.M"), who is a citizen of the United States, and their three children in housing leased by the United States Embassy for the family's use.  (Tr. 21:9-12, 25:18-26:13; Gov't Exs. 1, 3, 3A.)  The home had granite floors and concrete walls.  (Tr. 27:19-22.)

In early August 2011, A.C.M. was in Mali with the three children, while Makalou remained in Dakar.  (Tr. 27:23-28:11.)  A.C.M. and the children returned to Dakar on August 11, 2011.  (Tr. 28:14-15.)

On August 13, 2011, A.C.M. discovered that the housekeeper had brought home the wrong cut of meat from the butcher.  (Tr. 29:4-16.)  A.C.M. went into her bedroom to retrieve the car keys from the dresser, so she could drive to the butcher and return the meat.  (Tr. 29:14-16, 30:11-16.)  At that time, Makalou was in bed and asked A.C.M. where she was going.  (Tr. 30:11-22.)  When A.C.M. informed Makalou that she was going to the butcher to return the meat, he told her that she was not going anywhere and demanded the car keys.  (Tr. 30:22-31:9.)  A.C.M. handed Makalou the car keys.  (Tr. 31:9.)

A.C.M. asked Makalou why she could not go.  (Tr. 31:9-11.)  Makalou stated that he was not going to answer and told her to stop asking.  (Tr. 31:12-14.)  When A.C.M. continued to ask, Makalou jumped out of bed and backed his wife into a corner

of the room.  (Tr. 31:13-32:1.)  Makalou slapped A.C.M. in the face and put his hands around her neck.  (Tr. 32:1-3, 32:16-20.)  Makalou began to yell at A.C.M. and made insulting remarks.  (Tr. 32:5-8.)  A.C.M. tried to get away, at which point Makalou threw her on the bed and again put his hands around her neck.  (Tr. 32:22-23.)  A.C.M. ended up on the floor, and attempted to go between Makalou's legs.  (Tr. 33:20-21.)  Makalou proceeded to pummel A.C.M. on her back with both fists.  (Tr. 33:18-24.)  Makalou then put his knee on A.C.M.'s back and his hand over A.C.M.'s face.  (Tr. 34:7-11.)  In an attempt to break free, A.C.M. bit Makalou's right little finger.  (Tr. 34:10-17; 149:8-24.)

A.C.M. broke free and crawled outside of the bedroom.  (Tr. 34:18-19, 35:19-20.)  Makalou chased after A.C.M. and continued to beat her.  (Tr. 34:22.)  Makalou grabbed one of A.C.M.'s legs, and tried to drag her down the stairs.  (Tr. 34:22-25.)  A.C.M. kicked Makalou with her free leg and ran back to an upstairs hallway.  (Tr. 34:24-35:1, 35:12-17.)  A.C.M. fell onto the floor near some of the children's toys, at which point Makalou picked up a plastic dollhouse and slammed it onto her head.  (Tr. 34:24-35:3.)  The dollhouse weighs approximately nine pounds and eleven ounces.  (Tr. 155:16-23; Gov't Ex. 4.)

A.C.M. briefly lost consciousness.  (Tr. 35:4-5, 38:1-10.)  When she regained consciousness, Makalou was dragging her

down the stairs and her head was hitting the steps. (Tr. 35:5-7.) A.C.M. hooked one leg on the hand rail and pushed with her other leg, which Makalou had in his grip. (Tr. 35:7-8.) A.C.M. ran downstairs. (Tr. 35:8.) Makalou chased after her. (Tr. 35:8-9.)

Some time later, A.C.M. retrieved a towel to place on her head and on her side, which were sore. (Tr. 39:2-6.) She also obtained a pair of scissors, so she could cut the towel in half to distribute over her injuries. (*Id.*) When Makalou saw A.C.M. with the scissors, he forced her to hand them over, which she did. (Tr. 39:5-10.)

A.C.M. subsequently procured another pair of scissors, which she placed in her back pocket. (Tr. 39:11-16.) When Makalou saw these scissors, he demanded that she hand them over as well. (Tr. 39:12-13.) A.C.M. refused to do so, at which point Makalou cornered her. (Tr. 39:14-18.) Makalou pointed the first pair of scissors at A.C.M.'s stomach and threatened to kill her. (Tr. 40:15-19.) He then reached in A.C.M.'s back pocket to grab the second pair of scissors, cutting his left ring finger. (Tr. 39:14-18; 149:8-22.)

Makalou physically abused A.C.M. from about 9:30 a.m. until approximately 3:30 p.m. with intermittent breaks. (Tr. 41:5-17.) During the incident, Makalou spat on A.C.M. and wiped nasal mucus on her. (Tr. 44:8-45:2.) He also jumped on

4

A.C.M.'s back while she was on the floor, and kicked her in the side.  (Tr. 65:19-21.)

A.C.M. called the Regional Security Officer ("RSO") several times.  (Tr. 42:5-14.)  The RSO is responsible for the security of the Embassy and its employees.  (Tr. 42:11-12.) A.C.M. first tried to call the RSO from a telephone in the master bedroom.  (Tr. 42:16-18.)  Makalou saw her, and slammed the phone onto the floor.  (*Id.*)

A.C.M. subsequently called the RSO from another telephone.  (Tr. 42:18-20.)  A.C.M. made two phone calls.  (Tr. 42:22.)  Both times, she said nothing and hung up the phone. (Tr. 42:22-43:13.)  A.C.M. was scared and did not want to get Makalou in trouble.  (Tr. 43:1-3.)  Makalou had also told her that she was nobody and that the RSO would not believe her. (Tr. 43:3-8.)

A.C.M. subsequently called Sara Devlin, a State Department employee who was the Makalous' neighbor, and left a voice message.  (Tr. 45:4-22.)  A.C.M. asked Devlin to call back right away.  (Tr. 115:16-18.)  Devlin called back and asked A.C.M. if she was okay.  (Tr. 45:23.)  A.C.M. began to cry, and told Devlin that she was having problems with her husband.  (Tr. 45:24-25.)  A.C.M. asked Devlin not to come to the house, but Devlin insisted.  (Tr. 46:1-6.)

Devlin arrived at the Makalou residence at approximately 5:15 p.m.  (Tr. 120:1-3.)  When Devlin saw A.C.M., she noticed that her face was swollen.  (Tr. 121:18-22.)  Devlin took A.C.M. and the Makalous' two daughters to the Devlin residence.  (Tr. 46:7-8.)  Makalou and the Makalous' son remained at the Makalou residence.  (Tr. 46:8-9.)  At the Devlin residence, A.C.M. began to sob, and described to Devlin the physical abuse she had just endured.  (Tr. 48:9-17, 123:23-124:5.)  A.C.M. told Devlin that Makalou had beaten her throughout the day, spat on her and blew nasal mucus on her, pushed her to the floor, dragged her, and hit her in the head with the children's dollhouse.  (Tr. 130:2-22.)

A.C.M. pleaded with Devlin not to call the RSO, but Devlin insisted that she report the incident.  (Tr. 49:2-24.)  Devlin contacted the RSO, and Special Agent Kerry Osterhout responded to the Devlin residence.[2]  (Tr. 51:1-18.)  A.C.M. showed Devlin and K. Osterhout her thumb, which was swollen, as well as bruising on her back.  (Tr. 135:15-18.)  K. Osterhout summoned medical personnel so that A.C.M. could be evaluated and treated.  (Tr. 51:19-52:7.)

A.C.M. wanted to return to her house to speak with Makalou and retrieve some personal effects.  (Tr. 52:10-22.)

---

[2] Kerry Osterhout's husband, Thad Osterhout, is also a Special Agent of the Diplomatic Security Service who responded to Devlin's call.  (Suppression Hr'g Tr. 4:8-10, 5:20-6:6, 7:3-4.)  Kerry Osterhout is referred to herein as "K. Osterhout" and Thad Osterhout is referred to herein as "T. Osterhout."

6

Over K. Osterhout's objections, A.C.M. did so.  (Tr. 52:23-53:4.)  A.C.M. told Makalou that her head was hurting badly, and asked him to take her to the doctor.  (Tr. 53:16-19.)  Makalou told A.C.M. to take two Tylenol and to lie down for fifteen minutes.  (Tr. 54:19-21.)  Upset by Makalou's lack of concern, A.C.M. returned to the Devlin residence.  (Tr. 53:22-54:3.)

Dr. Kelii Gurfield of the Regional Medical Office arrived at the Devlin residence and examined A.C.M.  (Tr. 54:14-18; 163:11-164:2.)  A.C.M. told Dr. Gurfield that Makalou had beaten her repeatedly with his fists and feet, hit her with a dollhouse, spat on her, choked her, and dragged her by her legs.  (Tr. 165:19-23.)  She also reported losing consciousness.  (Tr. 165:24-25.)  While examining A.C.M., Dr. Gurfield observed multiple contusions over A.C.M.'s body, a laceration on her gum line, a bruise in the right thumb area, and an abrasion on her forearm.  (Tr. 166:7-167:3.)  A.C.M. stated that she had tenderness in multiple locations.  (*Id*.)  Afterwards, A.C.M. was taken to the Embassy Health Unit for a CT scan and x-rays.  (Tr. 56:1-7; 169:19-21.)  Dr. Gurfield's diagnosis of A.C.M. dated August 14, 2011, included loss of consciousness and a suspected concussion.  (Tr. 172:17-19; Gov't Ex. 9A.)  He also noted the multiple contusions and the laceration on the gum line as well as "[d]omestic violence concerns, safety issues."  (Tr. 172:20-22; Gov't Ex. 9A.)  After speaking with A.C.M. on the

telephone, Dr. Gurfield made another diagnosis on August 15, 2011, in which he concluded that A.C.M. had suffered a concussion.  (Tr. 172:23-173:1; Gov't Ex. 9B.)  He testified that his diagnosis was consistent with an assault, and that the diversity of locations in which A.C.M. had sustained injuries was explainable by multiple blows at different locations at different times.  (Tr. 173:14-21.)

K. Osterhout took photographs of A.C.M.'s injuries the night of the incident.  (Tr. 56:14-16, 57:20-58:1.)  The photographs revealed a swollen right thumb and bruises and abrasions on A.C.M's arms sustained as a result of Makalou's physical abuse.  (Tr. 58:15-61:17; Gov't Exs. 7A-7E.)  Government Exhibit 7C depicts an abrasion near A.C.M.'s elbow, which she received when Makalou threw her against one of the home's concrete walls.  (Tr. 60:11-14; Gov't Ex. 7C.)  K. Osterhout returned to see A.C.M the morning after the incident, and took additional photographs.  (Tr. 61:18-20, 63:3-22.)  These photographs revealed more bruising on A.C.M.'s arms and legs, consistent with A.C.M.'s description of Makalou's physical attack.  (Tr. 63:10-65:16; Gov't Exs. 7F-7H.)

The night of the incident, Special Agents T. Osterhout, William Alfano, and Nicholas Hicks went to the Makalou residence to conduct a safety and welfare check, to retrieve passports belonging to A.C.M. and the children, and to

take custody of the Makalous' son and transport him to Devlin's residence. (Suppression Hr'g Tr. 8:20-9:2, 11:20-24, 25:20-26:13.) During the welfare check, Makalou insisted on telling his side of the story. (Suppression Hr'g Tr. 11:10-19, 13:7-24, 26:16-20.) After telling Makalou that he did not need to make any statements, Hicks and Alfano agreed to sit in his living room and listen to his version of the events. (Suppression Hr'g Tr. 26:21-27:3.)

Makalou admitted to Hicks and Alfano that he and A.C.M. had fought on and off for most of the day. (Suppression Hr'g Tr. 28:4-5.) He also stated that he pushed A.C.M. towards the door in an attempt to get her out of the house, and that in the course of doing so, A.C.M. fell down several times. (Suppression Hr'g Tr. 28:13-21.) Makalou claimed that one time when A.C.M. fell, she slapped him in the face, and that he struck her back. (Suppression Hr'g Tr. 28:21-24.) Makalou told the agents that he had sustained two injuries –- one to his right little finger and the other to his left ring finger. (Tr. 149:8-11, 150:11-17.) Dr. Gurfield later examined Makalou's injuries. (Tr. 192:1-3.) He testified that the injury to the little finger was a "partial thickness dermal injury," meaning the dermis, or living skin cell layer, was not completely torn through. (Tr. 197:10-22.) He did not see evidence of a laceration to Makalou's ring finger. (Tr. 197:23-198:4.)

9

The morning of August 14, 2011, Hicks and Alfano returned to the Makalou residence to document Makalou's injuries and to provide him an opportunity to make a written statement. (Suppression Hr'g Tr. 30:16-21.)  Makalou submitted a written statement after receiving and signing a *Kalkines* warning.[3] (Suppression Hr'g Tr. 31:2-20, 32:17-18; Tr. 150:25-151:18.)  In his written statement, Makalou admitted that he slapped A.C.M., and dragged her in an attempt to remove her from the house. (Tr. 151:20-152:7; Gov't Ex. 13.)

A.C.M. returned to the United States with her children on August 16, 2011.  (Tr. 66:10-15.)  She made contact with Special Agent Shawn Conrad, who took pictures of her injuries that same day.  (Tr. 66:18-67:17; Gov't Exs. 8A-8G.)  Government Exhibits 8A through 8D reveal the same bruises depicted in pictures taken by K. Osterhout, which had since darkened.  (Tr. 68:12-69:20; Gov't Exs. 8A-8D.)  Government Exhibit 8E depicts the abrasion A.C.M. sustained near her elbow when she was thrown against the concrete wall.  (Tr. 69:21-70:3; Gov't Ex. 8E.)

---

[3] A *Kalkines* warning is an advisement of rights given to federal employees in connection with internal investigations.  The *Kalkines* warning in this case read as follows:

> You are being asked to provide information as part of an investigation being conducted by the Department of State.  This is a voluntary interview.  Accordingly, you do not have to answer questions.  No disciplinary action will be taken against you solely for refusing to answer questions.  Any statement you furnish may be used as evidence in any future criminal proceeding or agency disciplinary proceeding, or both.

(Gov't Ex. 12.)

Government Exhibit 8F reveals bruising on A.C.M.'s lower back. (Tr. 70:4-16; Gov't Ex. 8F.) And lastly, Government Exhibit 8G depicts a bruise and an abrasion on A.C.M.'s arm. (Tr. 70:17-20.)

On September 2, 2011, Makalou engaged in a voluntary interview with Special Agents Shawn Conrad and John Stemen. (Suppression Hr'g Tr. 45:10-20.) During the interview, Makalou again admitted that he pushed his wife, and acknowledged that she might have fallen down and hit her head. (Suppression Hr'g Tr. 56:16-17.) He also stated that he slapped A.C.M. and kicked her in the buttocks. (Suppression Hr'g Tr. 58:2-5, 58:25-59:3.) Makalou further admitted that he dragged A.C.M. by her legs and waist. (Suppression Hr'g Tr. 59:7-8.) He claimed that he never threw anything at A.C.M., and denied hitting her in the head with the dollhouse. (Suppression Hr'g Tr. 59:10-15.) Following this interview, Makalou was arrested at the Diplomatic Security Service's headquarters in Arlington, Virginia, within the Eastern District of Virginia. (Tr. 112:10-15.)

## II. Credibility Determinations

The evidence presented by the parties is conflicting. Nonetheless, in sorting through the evidence, the Court finds A.C.M's testimony more credible than Makalou's. The Court assesses credibility based on the content of the witnesses' testimony as well as their demeanor, cadence, tenor, tone, and

11

inflection of voice.  Government Exhibits 7A through 7H and 8A through 8G corroborate A.C.M.'s testimony, and indicate that she was the victim of a physical attack by Makalou.  Moreover, A.C.M.'s testimony was entirely congruent with the narratives she gave both Devlin and Dr. Gurfield just after the incident occurred.  The Court finds Devlin and Dr. Gurfield credible as well.

While a written statement made by A.C.M. did not mention being struck by a dollhouse or being thrown against a concrete wall (*see* Gov't Ex. 16), A.C.M. explained that she wrote the statement late the night of the incident, that she was crying while she wrote it, and that she did not include every detail but instead simply wanted to put something down, (Tr. 104:1-20).  Indeed, the statement consists of only a few sentences.  (*See* Gov't Ex. 16.)  What A.C.M. did write was consistent with her testimony –- namely, that Makalou beat her over multiple hours, that he jumped on her back, that he dragged her down stairs, and that he spat at her and blew his nose on her.  (*Id.*)  Lastly, both Devlin and Dr. Gurfield testified that A.C.M. told them shortly after the incident that Makalou had hit her in the head with a dollhouse.  (Tr. 130:7-8, 165:19-20.)

Makalou's credibility was undercut by inconsistencies between his testimony at trial and his previous statements.  In

12

his interview with Hicks and Alfano, for example, Makalou stated that he and A.C.M. fought for most of the day, but at trial he testified that the incident ended around 9:30 or 10:00 in the morning. (Tr. 230:7-8.) This claim is also contradicted by Devlin's testimony that A.C.M. was in an exasperated state much later in the day. (Tr. 116:21-117:19, 123:23-124:5.) In addition, Hicks testified that on the night of the incident Makalou only informed special agents of the injuries to his little finger and ring finger. (Tr. 149:8-11, 150:11-17). Makalou testified at trial that he additionally injured his shoulder, elbow, and wrist when A.C.M. pulled on his arm and when he tried to extricate his finger from her mouth (Tr. 237:13-238:12), and claimed that he told this to Hicks and Alfano, (Tr. 239:4-7).

Makalou's testimony also differed from his interview with Conrad and Stemen. Conrad testified, for example, that Makalou told him he pushed A.C.M. and that she may have fallen and hit her head. (Suppression Hr'g Tr. 56:16-17.) Makalou denied this at trial, testifying that he tried to "remove" A.C.M. from the house and that she fell because she lunged at him. (Tr. 248:15-249:8.) Conrad and Stemen both testified that Makalou told them A.C.M. threw the dollhouse at him, and that he blocked it and pushed it back towards her. (Suppression Hr'g Tr. 59:12-14; Tr. 287:9-20, 290:1-5.) At trial, however,

13

Makalou's testimony was that A.C.M. slid the dollhouse at him and that the dollhouse never left the ground. (Tr. 221:22-25.) Indeed, Makalou incredibly claimed that he could not pick the dollhouse up because of injuries to his hand and arm. (Tr. 250:6-8.) When the Government reminded Makalou that he did not bother mentioning the arm injury to the special agents, Makalou switched gears and stated that the arm injury developed over time, but that the hand injury caused him significant pain the day in question. (Tr. 250:9-25.) Based on Dr. Gurfield's testimony, however, Makalou's hand injury was relatively minor. (Tr. 197:10-198:4.) On cross-examination, Makalou glibly accused the special agents of lying but could not fashion a reason why they would do so. (Tr. 239:8-13.) The Court finds T. Osterhout, Hicks, Conrad, and Stemen credible.

Further undermining Makalou's credibility was his inability to explain his wife's injuries. At trial, Makalou admitted only that he slapped A.C.M. after being struck in the face, and that he kicked her in the buttocks. (Tr. 219:20-220:7, 230:11-25.) When presented with the photographs of A.C.M.'s bruises and abrasions during cross-examination, Makalou was without explanation. (Tr. 251:19-253:8.) For these reasons, the Court concludes that A.C.M. and the other witnesses called by the Government are more credible than Makalou.

### III. Conclusions of Law

In order to convict Makalou of assault with a dangerous weapon as charged in the indictment, the Government had to prove each of the following elements beyond a reasonable doubt: (1) that the incident in question took place within the special maritime and territorial jurisdiction of the United States; (2) that Makalou assaulted A.C.M.; (3) that Makalou used a dangerous weapon; and (4) that Makalou acted with the intent to do bodily harm. 18 U.S.C. § 113(a)(3); *United States v. Sturgis*, 48 F.3d 784, 786 (4th Cir. 1995). The Government has satisfied its burden as to each element. The Court will address each in turn.

First, the Government proved beyond a reasonable doubt that the incident took place within the special maritime and territorial jurisdiction of the United States. 18 U.S.C. § 7(9) states that in cases involving offenses committed by or against a national of the United States, the term "special maritime and territorial jurisdiction of the United States" includes "the premises of United States diplomatic, consular, military or other United States Government missions or entities in foreign States, including the buildings, parts of buildings, and land appurtenant or ancillary thereto or used for purposes of those missions or entities, irrespective of ownership" as well as "residences in foreign States and the land appurtenant or

ancillary thereto, irrespective of ownership, used for purposes of those missions or entities or used by United States personnel assigned to those missions or entities." 18 U.S.C. § 7(9). The Government presented testimony from A.C.M. as well as an executed lease, which reflects that the Makalou residence -- the location where the incident took place -- was leased by the State Department for use by personnel assigned to the United States Embassy in Dakar.

Second, the Government proved beyond a reasonable doubt that Makalou assaulted A.C.M. The term "assault" is not defined in the statute. However, "where a federal criminal statute uses a common-law term of established meaning without otherwise defining it, the general practice is to give that term its common-law meaning." *United States v. Turley*, 352 U.S. 407, 411 (1957). Indeed, numerous courts have applied the common law definition of assault in cases involving 18 U.S.C. § 113. *See, e.g.*, *United States v. Gauvin*, 173 F.3d 798, 802 (10th Cir. 1999); *United States v. Guilbert*, 692 F.2d 1340, 1343 (11th Cir. 1982) (per curiam); *United States v. Dupree*, 544 F.2d 1050, 1051 (9th Cir. 1976) (per curiam); *see also United States v. Passaro*, 577 F.3d 207, 217–18 (4th Cir. 2009) (recognizing that other courts have uniformly held that federal statutes criminalizing "assault" incorporate the common law definition). "At common law, an assault is committed when a person willfully attempts to

16

inflict injury on another, or threatens to inflict injury on another, coupled with an apparent present ability to do so, causing a reasonable apprehension of immediate bodily harm." *United States v. Bird*, 409 F. App'x 681, 686-87 (4th Cir. 2011) (unpublished); *see also Dupree*, 544 F.2d at 1051.  At trial, the evidence established that Makalou struck his wife with his fists, kicked her, threw her into a concrete wall, dragged her down stairs, and slammed a large dollhouse onto her head.  This display of physical force not only gave A.C.M. reason to fear or expect bodily harm, but inflicted actual injury as well.

Third, Makalou used a dangerous weapon to assault his wife.  A dangerous weapon is an object, instrumentality, or part of the body used by a defendant in a manner that has the potential to inflict serious bodily harm.  *See Sturgis*, 48 F.3d at 787.  "[W]hat constitutes a dangerous weapon depends not on the object's intrinsic character but on its capacity, given 'the manner of its use,' to endanger life or inflict serious physical harm."  *Id.* (quoting *United States v. Johnson*, 324 F.2d 264, 266 (4th Cir. 1963)).  Thus, "an object need not be inherently dangerous to be a dangerous weapon."  *Id*.  "Rather, innocuous objects or instruments may become capable of inflicting serious injury when put to assaultive use."  *Id*.  The question of whether an object is a dangerous weapon "invites a functional inquiry into the use of the instrument rather than a

metaphysical reflection on its nature." *Id.* at 788. Moreover, "it is not necessary that the object, as used by a defendant, actually cause great bodily harm, as long as it has the capacity to inflict such harm in the way it was used." *United States v. Moore*, 846 F.2d 1163, 1166 (8th Cir. 1988) (citing *Johnson*, 324 F.2d at 266).

In this case, the evidence established beyond a reasonable doubt that Makalou slammed a plastic dollhouse onto his wife's head. While the dollhouse was not intrinsically dangerous, the manner in which Makalou used the dollhouse to inflict bodily injury rendered it a dangerous weapon. The dollhouse was a substantial object, weighing nine pounds and eleven ounces. It had sharp edges and corners. Makalou used the dollhouse to strike A.C.M. in the head with such force that A.C.M. lost consciousness. Given the dollhouse's weight and shape, it could have inflicted even more serious harm had the blow landed differently, perhaps endangering A.C.M.'s eye or causing a dangerous head wound. For these reasons, the Court concludes that Makalou assaulted A.C.M. with a dangerous weapon.

Fourth, Makalou clearly acted with an intent to do bodily harm when he beat A.C.M. with his fists, kicked her, threw her against a wall, dragged her, and struck her with the dollhouse. Thus, the Government met its burden as to all four elements of the charged offense.

18

Makalou asserts that he acted in self-defense.  The existence of "just cause or excuse" is an affirmative defense to a charged violation of 18 U.S.C. § 113(a)(3), and the Government does not have the burden of pleading or proving its absence. *United States v. Jackson*, 205 F.3d 1335, 2000 WL 194284, at *2 (4th Cir. Feb. 18, 2000) (unpublished table decision) (citing *Guilbert*, 692 F.2d at 1343).  The evidence introduced at trial does not support Makalou's self-defense theory.  A.C.M.'s testimony indicated that Makalou was the aggressor and physically attacked her because he did not want her to leave the house and run an errand.  This testimony was corroborated by that of other Government witnesses and photographs of A.C.M.'s injuries.  In contrast to A.C.M.'s numerous bruises and abrasions, the evidence revealed that Makalou had just two superficial injuries to his hands, one of which he sustained by pulling scissors out of A.C.M.'s pocket.  In addition, A.C.M. attempted to call the RSO and did call Devlin, further supporting that she was the victim in this case.  As noted above, Makalou was not credible, and his testimony was rife with inconsistencies.  In sum, the evidence demonstrates that Makalou was the aggressor, and that his self-defense theory is without merit.

For these reasons, the Court finds Makalou guilty of assault with a dangerous weapon in violation of 18 U.S.C. § 113(a)(3).

An appropriate Order will issue.

|  |  |
|---|---|
| February 8, 2012<br>Alexandria, Virginia | /s/<br>James C. Cacheris<br>UNITED STATES DISTRICT COURT JUDGE |